Andermann v. Sprint Spectrum. Mr. Puglisi. May it please the court, counsel. Good morning. Fred Puglisi on behalf of the appellant Sprint Spectrum. I think I'd like to start today by framing the issue based on this court's precedents, and in particular, sweet dreams. And if you do that, you can form this issue as, can it be said with positive assurance that a call to tell a party their contract has been assigned to another party does not relate to the contract? To pose the question in that light obviously answers the question. It can't be said with positive assurance that calling somebody to tell them their contract has been Similarly, can it be said with positive assurance that a call to tell someone their cellular service was going to expire because of this assignment and their handset would no longer work as of a certain date? But isn't that valuable information for the subscriber or ex-subscriber to receive? Absolutely, and it relates directly to the contract, which is the point. That's why it does relate to the contract. That's why the lower court erred. Oh, I see. Of course, you're from the next house. I'm the appellant here. The facts in this case are pretty simple. I mean, this is not one of those complex ones. You have the Andermans who have a contract for service with US Cellular. US Cellular assigns and sells the contracts to Sprint as part of a corporate deal. Their phones won't work on Sprint's system. This shouldn't come as a surprise to anybody who has ever transferred or changed cell phones. You've got to buy a new cell phone. They don't work. As a result, even though they had just renewed their contracts recently, their service was going to expire. Sprint simply reached out to them to tell them that. I mean, there's no dispute anywhere in this record that they called them to tell them, hey, we have the contract. Hey, your service is about to expire. You've got to take action. And hey, we know that's an inconvenience, but we have certain deals available just to you to help ease your pain. The contract had expired, correct, at the time the calls are at issue? It had expired a couple of weeks earlier, correct? Correct, your honor. They had ported their lines. Now, I know that there's a provision in the arbitration clause that says it survives the termination of the agreement. This is my question. Does that give you license to call them at any time after the termination? If it's two years later, can you still pester them? Does it arise out of and relate to the contract, or is it a farce? Is it just a pretext for your call? Keep in mind, there's no evidence here that there's a farce. There's no evidence here that there is a pretext. There is a bright, clear line that I'm articulating. Does it relate to or arise out of the contract? Here, it clearly did. Weren't they trying to sell them to Sprint Services? That's the reason they're calling them. No, they're calling them for three reasons. One, to let them know that the contract is expiring, that they need to do something. And when you look at this whole idea of marketing, you have their letter, the letter that went to them that delineates these special deals. These are not the special deals that you're seeing in your TV ads or in your paper. These are special deals just for you, because you're inconvenienced. We know. You had a system. You were on a subscriber system. Now you've got to make a change. So what are we going to do? You've got to get a new handset? Just for you, as a former US cellular customer, we'll give you some additional money off the new handset to make it easier, cheaper. Normally, you're charged a fee when you port a number on to somebody, an activation fee. We're going to credit you the activation fee. Normally, you're charged a certain amount for your monthly subscription. We're going to give you a discount on that, all because we know you have this contract, and it's been interrupted, if you will, not because of anything you did, but because of two corporations making a decision that one would sell and one would buy. But that relates and arises out of the contract. The other word this court has used on occasion is the genesis, right? All of this has its genesis, its origin, in the contract. There's no evidence anywhere in this record that but for this contract, the assignment, and all the things I just mentioned, we'd have ever called them. That's not what happened here. This is not, as Your Honor was maybe suggesting, some sort of after-the-fact pretext. They're not on our system. They're porting off a US cellular system. There is no evidence in this record anywhere that we had any clue that it happened shortly after or shortly before we called them. I mean, the evidence shows that we sent them a letter and that we called them both before and slightly after. I started by mentioning Sweet Dreams. I think Sweet Dreams is a good case here, not just because it's one where this court compelled arbitration of claims arising after an agreement had terminated, but I think it's a good case here because of the precedent set by this court. I know in the cases they cite, or they cite a lot of cases in their brief from out-of-state or out-of-district, out-of-circuit courts, but let's look what this court has told us. What this court has said is that an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not acceptable of an interpretation that covers the asserted dispute. I've already established that. Court also said, we find, however, that a rising out-of reaches all disputes having their origin or genesis in the contract, whether or not they implicate the interpretation or performance. This court quoted the Supreme Court as saying any doubt is resolved in favor of arbitration. What's the difference between origin and genesis? Your Honor, I wouldn't dictate what this court meant by it. To me, they're almost synonymous. But I think what it means is that it's growing out of. It has its origin. It has a connection, which is the other thing this court said. You can use a lot of different words, all of which are intended to convey the same meaning in this context. Be nice to settle on one word, right? You know, if we only had one word, it would be a boring language. I mean, it's very. No, I'm not suggesting we reduce the English language to one word. I agree. It would actually impede communication. If I could clarify the skirmish about who the proper party is, here, as the defendant, Nextel was the originally named defendant. But that wasn't right. And I think there was a correction in the caption that hasn't quite caught up with our caption yet. Excuse me, Your Honor. I got a little bit of a cold. Correct. I don't know what the exact caption states. But we have told them that, hey, the right party here is Sprint Spectrum. And Sprint Spectrum is the party that bought the US cellular assets. Correct. And Nextel is an affiliated or a subsidiary? Nextel has no relationship to this whatsoever. I think what happened is they simply looked for a company within the Secretary of State's records and happened to settle on that one or something. I don't know how they got that name. You'd have to ask them. Nextel is totally unrelated. But now there's a skirmish about whether Sprint Solutions, which is actually the contracting agent of Sprint Spectrum. Correct. So what happened, if you look at the contract, you have Sprint Spectrum that purchases the assets, which include not just the customer accounts, but other things. But they purchase it. Their contracting agent, for purposes of interfacing with the public, is Sprint Solutions. Which is a subsidiary. It's a subsidiary of Sprint Corporation. OK, which is the holding company. That's the big one on top of everybody. OK. But there's no doubt, there's no dispute, really, that Sprint Solutions is our agent. We are their undisclosed principal for purposes of this agreement. They themselves put that evidence in the record. They didn't object to it. We didn't object to it. It's in the evidence. And they themselves do not contest the fact that if we're an undisclosed principal, which we are, we can enforce the arbitration clause. Now this court knows, I mean, one other thing, let me just say one more thing for Sweet Dreams, because I think it's important. In Sweet Dreams, some of the conduct did, in fact, occur. A lot of it occurred after the agreement had terminated. And the court had this to say about that. If the parties had wished to limit the duty to arbitrate to the term of the agreement itself, they could have said so explicitly. Instead, they used language that evinces an intent to commit to arbitration any dispute connected with the contract, irrespective of when it occurs. It isn't an issue of when something happened. It's an issue of that connection, the genesis, rising up, relating to. That's what we have here. Now the trial court denied our motion because of Jiffy Lube. I would argue that Jiffy Lube, there are four cases that I'm aware of that deal with TCPA claims and efforts to arbitrate. Three go my way. Jiffy Lube is the one that goes, in theory, against me. Although I would agree with Jiffy Lube. You've got to remember, in Jiffy Lube, the real reason the court denied the request is because of this court's decision in Steinkamp. Justice Posner pointed out how absurd results come about if you engage in this idea that any dispute, not just any dispute related to the contract, but how if you say any dispute, that renders it unconscionable. That was the actual holding in Jiffy Lube. It was in dicta that the court went on to say, even if I rewrite this contract, which I'm not willing to do, even if I rewrite it, I don't think this conduct is connected enough to the contract. What was the contract there? Somebody goes in to get an oil change. After the fact, they get a text message saying, hey, sign up for our club, and you get discounts on oil changes. That is so dissimilar from this case. The court, I mean, there's just no rational connection whatsoever to the facts of this case and that case. On the other hand, I would say if you look at Shea and Sherman, you're going to find the identical facts. Both cases involve situations where the court was faced with a contact. In one instance, a bank sent an updated app to a cell phone after the bank's contract with the customer had expired. Court said, no, that's related to it. In Sherman, it was calling about a car that had been purchased three years ago and had been disposed of two years and three months earlier. But because it related to the underlying transaction, they compelled arbitration. That's what should occur here. And unless the court has any other questions, I'll reserve the rest of my time for rebuttal. OK, thank you very much, Mr. Pugliese. Mr. Bland? If it pleases the court, my name is Paul Bland. I represent the appellees, the Andermans. If the court will commit, I'd like to start with Judge Sykes' issue that you raised around who is the proper party. Because there is a basic rule in general that an arbitration agreement can only be enforced by the parties to the agreement. And the defendant here is not a party. Sprint Spectrum came in and said, we're the proper defendant. And so the wrong party was sued originally. What difference does it make? It makes an enormous difference, Your Honor, because first of all, there is a strong presumption under Illinois law that contractual rights for third party, that there are no contractual rights. I mean, what difference, what injustice would result if we treat these two Sprint divisions or companies, whatever you want to call them, as one? To answer your question, I think that the injustice is if a party has not agreed to arbitrate with another party that the contract shouldn't be enforced. Look, these are just subsidiaries, right? A pair of subsidiaries. What would be the consequence, except throwing out as appeals, what's the consequence of saying it has to be Sprint Spectrum or Sprint Solutions or has to be named as the party? If it's the other one, it's a fatal error? Your Honor, I strongly believe that in deciding who is agreed to a contract, that the language of the contract matters. It's not just a technicality. Why does it matter? Why? What difference could it make whether it's Sprint Solutions or Sprint Spectrum? Well, it obviously mattered to Sprint. Sprint's decided to operate. What does it matter to you? What matters to us, Your Honor, is our clients agreed to a contract with one party. What difference does it make whether it's Sprint Spectrum or Sprint Solutions that they have the contract with? Is there some difference between these two affiliates? Your Honor, if so, what is the difference? I understand your point. My answer is that in deciding and looking at whether or not a contract has been formed between two parties, you look at the language of the contracts and the related documents, and that matters. But why does it matter? Often, it matters. Why does it matter here? Why should courts take cognizance of discrepancies or mistakes or something that don't matter to anybody, that don't have any consequences? Well, I think that what was just a gotcha kind of argument that you're making. With respect, I don't believe it is. I think that the parties that are named in a contract What is the real world consequence of naming the wrong affiliate? Because when you have a doctrine like they're talking about the undisclosed principles about who do you have an agreement with, and you're saying, you think you have an agreement with this company, but in fact, they could secretly give it to someone else. I know, that's what I keep asking you. Now, what would be the consequence of your having put the wrong affiliate as the signer of the contract? Does that lead to deception, to errors on your part, can't collect bills, pay more? What? Anything like that. I don't have anything like that, Your Honor. Anything like anything. Actually, because your contract was with US Cellular. Right. And that contract said. And so you can't possibly have been misled by any corporate structure at Sprint. And that contract said that it could be assigned. And then they assigned it, and there was a document of the assignment that's in the record in which they clearly assigned nothing to Sprint Spectrum, and everything was assigned to this other entity. Then they come forward and say, oh, you sued the wrong entity. Here's the right entity, it's Sprint Spectrum. But there is no document that links Sprint Spectrum to this point. Well, did they say that? Yes, in the first footnote of their motion to compel arbitration, they said Sprint Spectrum is the proper party, and that's who you should have sued. And Sprint Spectrum. Are you saying you were misled so that if you had known it was Sprint Spectrum and not Sprint Solutions, you wouldn't have dealt with them, or what? No. The argument that I'm making is that in looking at, I mean, the Supreme Court said in the Stolten-Nielsen case that parties can choose. Look, I'm just asking you how you were harmed. There is not a concrete harm to our clients. OK, well, how about a rubber harm, or something softer than concrete? All right. When there is both a Supreme Court law under the FAA and state law in Illinois under Illinois law that says that who a party contracts with is an important issue. If it's important, presumably it's important, because if you screw up, you cause a harm. If you don't cause any harm, why should they be worried? Well, here, part of what's going on is that when they're saying that you're saying you can have an undisclosed principle, how is a consumer ever going to determine who they're dealing with if they can take changes  So you don't know who you're dealing with? Is that your problem? Well, we've now determined who the actual entities are, but they aren't covered by the language of the contract. Did you incur some harm for some period of time when you were in uncertainty as to who you were dealing with? There's nothing of that sort. Can I give a hypothetical? Well, what is? No. What is the harm? I'm just asking you to tell me how you were hurt by this change in subsidiaries that they engineered. There is no direct harm to our clients. All right. How about an indirect harm? Our clients have an agreement with one party that says that they can be changed. No. I want a harm, direct, indirect, oblique, invisible, whatever. My position is that if you have an agreement with a party and they change it to someone else, that is the harm they're saying. So we can agree there's no harm of any sort. I believe that having a contract with one entity is a friend of a person. There's no harm of any sort, right? You can't name, you can't specify a harm. Somebody who is not a party to the agreement. You can't specify a harm. Is that correct? Then if you admit that, we can move on to the next issue. I cannot specify harm of that sort. But I do think that, if I can make it clear. No. Move on to the next issue. The scope issue? OK. Whatever you want. I believe this case is just like the Steinkamp case, Your Honor. In Steinkamp, two parties entered a contract for a particular service. The contract contained a very broad arbitration clause, just as broad as this, or even slightly broader. The same is true in this case. The contracts, the Andermans had a contract with US Cellular. The contract came to an end when they ported their contract. In Steinkamp, the question was whether the arbitration clause in the original contract applied to it later. So you have cases on your side, and they have cases on their side? And I believe that the Steinkamp case is much closer. Now, why are your cases better than their cases? The Steinkamp case is much closer. Because what happened in Steinkamp was that you had one transaction, and then it ended. And then you had a second transaction between the same parties. The first transaction was covered by an arbitration clause. What this court said, in Your Honor's opinion, was that the second transaction was a separate, distinct item. And so what's happened here is that after the first contract has ended, at that point, then you have Sprint reaching out and trying to sell them additional services, which is essentially what happened in Steinkamp. They actually entered a contract for additional services. Here, they're trying to solicit additional services. And what this court said was, claims relating to and arising from the first contract do not extend to the second separate transaction. Was there a provision in that case that it survives the termination of the agreement? There was nothing that, I don't think there was one. And that's a big distinction, right? In this case, it's explicit that it survives the termination of the agreement. So if they're calling relating to the contract, then you have to go to arbitration. Well, first, Your Honor, I would say they weren't calling relating to the contract because the contract's already ended. And also, with respect to surviving the agreement, what that says, Your Honor, is that's talking about if something was within the scope of the arbitration clause in the first agreement, then that dispute would continue after the contract ends. So for example, several of the cases that they cite are cases where you'll have a contract, and then afterwards, there's a dispute about a debt collection related to that contract. And that does, the arbitration clause would survive. So if what had happened was that our clients had not paid a debt to US Cellular, and then Sprint Solutions came in and was pursuing them on that debt, that then that would be covered. The arbitration clause would survive. But it doesn't mean that you change the scope of the arbitration clause to not only involving claims that relate or arise from the first contract, but that now the scope has changed. The claims here do not arise or relate to the first contract under the Steinkamp case. Instead, what happened is these are claims involving a separate set of transactions that Sprint is proposing and attempting to enter. So the survival of the arbitration clause only matters if this court affirmatively answers the predicate question of, did the Andermans' claims arise from or relate to the contract? And so if they don't, then the survival of the arbitration clause, I think, is more talking about things like debt collection. But arising out of or relating to, that's very broad, isn't it? Yes, and in fact, in the Steinkamp case, it not only said arising and relating out of, it also said directly or indirectly. So it's even broader. Right, the Steinkamp case had to do with bootstrapping an arbitration clause from an earlier loan onto a later loan that had no arbitration clause. That's not this case. It's not even remotely this case. What we have here are a series of phone calls, I think six, made within two weeks of the porting of the phone number, reminding the plaintiffs that their contract has been purchased by Sprint and that Sprint has these additional offers to make to them after their service expires after the first of the year. But it's clearly relating to the agreement. Well, after the agreement has ended, Your Honor, then what they're doing is the gravamen of the calls is trying to sell these additional services after the contract has already ended. But they could have just, I assume you agree, they could just have notified you of the termination of your service, right? And they did. They sent a letter and so the Andermans already knew that. And that, in your view, that's where they had to stop, the notification. Well, after the agreement ended was when they had to stop. But with respect to the arbitration clause issue, after the agreement has ended and the Andermans have already moved on and are no longer clients, then what Sprint is doing is they are attempting to sell them additional services. And that is sort of like the second loans in the Steinkamp case. And the fact that they're saying, well, you had a contract with us, but now we want to sell you additional services. Suppose that in the Steinkamp case, instead of having a bricks and mortar payday lending store, instead that it was a payday lender that was online. And so when you sign up to get a second loan, there's something that says, well, you've come here before, greetings, welcome back, something like that. Would that have changed the outcome in the Steinkamp case to make the second payday loan connected or related to the first one? That's not exactly what's going on here, though. It's not, but I feel like it's now. So you all are basically opening with the reminder that the assets have been sold to Sprint, their contract has been sold, now owned by Sprint as their service provider, and that it's going to expire in a couple of weeks after the first of the year. Hi, this is Gloria, just reminding you of the impending termination of your contract, and we've got these services if you're interested. But then after they have terminated and they've ported, and the contract has ended, and Sprint continues repeating those calls again and again. Right, but that's not the premise of the phone call. The premise of the phone call isn't an after-the-fact solicitation, as you're trying to characterize it. The premise of the phone call is reminding them that their contracts have been purchased by Sprint, they have an election to make about whether they want to continue with Sprint or go with some other carrier, and here's these great deals that we've got. How is that not arising out of the pre-existing relationship? After the contract has been canceled and they've already moved on, and that goes through, then to continue to get these calls, there's no point in reminding people, you used to have a relationship with someone that we purchased, now the clear import, the grabbing of those calls, is trying to sell the additional service. I'm shifting back for a moment to the TCPA issue and the arbitration issue. It seems so odd. You think that they're canceling the service, and what they want to say to you, it's not a complete loss. If you continue with us, we'll give you a break. Now you think that's what people would like to know, right? It's not that they're being pestered and tormented by advertisers. Well, they'd receive the letter and the- It seems so strange. I mean, it's a pretty extreme law anyway, but to use it in this way, right? Well, I mean, to the extent that they had received- They're notifying, which you agree is legitimate, indeed required, and they're trying to soften the blow a little. By mentioning that you can get continued service with some discounts. Now why wouldn't everybody want to have that? Who would object to that? Why would anyone object to that? We're objecting after they have already ended the contract. What difference does it make? Why would you object? You need a cell phone. You've dealt with this company. You can move on, as you put it, to another company. But this company, if you stay with them, you get a break. Now, what's wrong with that? How can that be a harm? Just briefly, after they've canceled the contract and moved on to continue getting these calls that are trying to sell them services that they've already said they don't want, there are a lot of consumers who don't want to get a series of telephone robocalls. I don't believe it. OK, well, thank you very much, Mr. Bland. Mr. Pugliese, how much time? One minute? I don't think I have a lot of time, so just briefly. The distinction that you drew with regard to the Steinkamp case, I mean, Your Honor wrote it. It's apples and oranges to this case. On the last point, there's no harm. And you can't separate out. He just keeps trying to say, well, but it's after. It's after. But you've got to look at the whole premise of this. And it's the premise of it that clearly came out of the contract. And it should have been compelled arbitration. And that's all we're asking here. If the court has any questions, I'd be glad to answer them. Otherwise, I would just submit. OK, well, thank you, Mr. Pugliese. And we thank Mr. Bland as well. And the court will stand in recess.